IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, CHIEF JUDGE

Civil Case No. 01-cv-00568-LTB-PAC

CROSS COUNTRY LAND SERVICES, INC., a Texas corporation,

      Plaintiff,

v.

PB NETWORK SERVICES, INC., a Delaware corporation,
PB TELECOMMUNICATIONS, INC., a Delaware corporation,
LEVEL 3 COMMUNICATIONS, L.L.C., a Delaware limited liability company,
KIEWIT NETWORK SERVICES, INC., a Delaware corporation, and
KIEWIT CONSTRUCTION CO., a Delaware corporation,

      Defendants,

and

PB NETWORK SERVICES, INC., a Delaware corporation, and
LEVEL 3 COMMUNICATIONS, L.L.C., a Delaware limited liability company, and
KIEWIT NETWORK SERVICES, INC., a Delaware corporation,

      Third-Party Plaintiffs

v.

JAMES STEVENSON,
WILLIAM STEVENSON,
ED CROWSTON, and
LARRY ORTH,

      Third-Party Defendants.

_____

FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

_____

This action arises out of the construction of a fiber optics communications network across

the United States and in portions of Europe.  By previous Order of the Court, the issue of

damages and the claims against the individual Third-Party Defendants will be tried, if necessary, after liability among the remaining parties is determined.  Accordingly, trial to the Court on liability as to the claims of Plaintiff Cross Country Land Services, Inc. ("Cross Country") and Defendants PB Network Services, Inc. ("PBNS") and Level 3 Communications, L.L.C. ("Level 3") was held November 21 - November 22, 2005 and November 28 - November 30, 2005.  The specific claims at issue in this trial were (1) Cross Country's claims against PBNS for breach of a memorandum of understanding between the parties and for fraud and deceit; (2) Cross Country's claims against  Kiewit Network Services, Inc. ("KNS") for constructive trust and for breach of contract as the purported third-party beneficiary of a contract between KNS and PBNS; (3) Cross Country's claim for breach of contract against Kiewit Construction Co. ("KCC") as the purported third-party beneficiary to a guarantee that KCC provided to PBNS; (4)  PBNS's claim against Cross Country for breach of the memorandum of understanding between the parties; and (5) Level 3's claim against Cross Country for breach of its contract with PBNS.  In this diversity action, the parties agree that Colorado law applies.

## I. Findings of Fact

I find the following facts based on a preponderance of the credible evidence.

1.      Level 3 was organized for the purpose of building and operating a fiber optic communications network across the United States and in portions of Europe.

2.      Level 3 entered into a contract with KCC in 1998 to design and build the network (the "Project").

3.      KCC entered into a contract with, among others, KNS to perform many of the non-construction obligations under KCC's contract with Level 3.

4.      KNS then entered into a contract with PBNS for the design, engineering, permitting, and management of the acquisition of land across the United States in which to lay fiber optic cable and on which to install amplification stations.

5.      PBNS, in turn, entered into numerous subcontracts including one with Cross Country pursuant to which Cross Country would perform various functions relating to the acquisition of land for the Project.

6.      Cross Country then entered into subcontracts with several other entities, including former Plaintiff, Capital Land Services, Inc. ("Capital Land"), for personnel to assist Cross Country with its performance of services on the Project.

7.      The organizational structure for the Project is laid out in greater detail in **Defendants' Exhibit A,** a copy of which is attached hereto.

8.      PBNS began work on the Project pursuant to a one-page memorandum of understanding with KNS dated April 27, 1998 (the "KNS-PBNS MOU").  The KNS-PBNS MOU was intended to govern the relationship between KNS and PBNS until they negotiated a final contract.  The KNS-PBNS MOU provided that PBNS would be compensated for its work on the Project on a "cost-reimbursable basis."

9.      Cross Country likewise began working on the Project pursuant to a one-page memorandum of understanding with PBNS dated May 12, 1998 (the "PBNS-Cross Country MOU").  The PBNS-Cross Country MOU was drafted by PBNS and provided, in pertinent part, as follows:

> The parties intend to enter into a Subcontract for Services substantially similar to the Agreement to be executed between [PBNS] and [KNS].  The parties shall work together in good faith to negotiate a final Subcontract for Services and to complete the project

successfully.  Work will begin prior to execution of a Subcontract, and [Cross Country] will be compensated on a cost-reimbursable basis subject to any limitation on costs and/or multiplier agreed to between [KNS] and [PBNS].  Payments made on the basis of this MOU and draft Subcontract for services shall be made to [Cross Country] no more than fifteen (15) days after receipt of payment by [PBNS] from [KNS] for these same services.  Once the Subcontract for services has been executed by [PBNS] and [Cross Country], the payment provisions therein will control.  It is recognized and agreed that Subcontractor assumes the risk of nonpayment for its services in the event [PBNS] is not paid by [KNS].

10.     In August of 1998, the PBNS-Cross Country MOU was amended at Cross Country's request to provide PBNS with an incentive to pay Cross Country's invoices promptly.  Specifically, Cross Country agreed to a 0.5% discount on invoices paid within 2 business days after PBNS received payment from KNS.  In all other respects, the terms of the PBNS-Cross Country MOU were unchanged.

11.     Both the KNS-PBNS MOU and the PBNS-Cross Country MOU were utilized so that the parties could begin work without the delay that would be associated with putting final contracts in place.

12.     At the time of the execution of the PBNS-Cross Country MOU, PBNS and Cross Country agreed that Cross Country would be compensated at three day rates  (the "Day Rates") until its final rates were established in the PBNS-Cross Country Contract.  The Day Rates were as follows $425/day for general ROW/permit agents; $475/day for senior ROW/permit agents; and $615/day for supervisory ROW/permit agents.  Dick Moore of PBNS, who worked with Cross Country in setting the Day Rates, recalls telling Cross Country that the Day Rates were provisional until the parties finalized a subcontract.  Moore's recollection in this regard is consistent with the language of the PBNS-Cross Country MOU.

13.     Cross Country performed its services on the Project through its own employees

4

and through individuals who were employees of other right of way companies but assigned to work for Cross Country on a temporary basis. This latter category of workers are referred to as job shoppers, and the job shoppers' regular employers are referred to as service providers. Cross Country billed both its own employees and the job shoppers to PBNS at the Day Rates and was paid by PBNS at these rates from May 12, 1998, to November 6, 1998.

14.     KNS and PBNS entered into a final contract regarding the Project on September 22, 1998 (the "KNS-PBNS Contract"), which was complete with the exception of an agreement as to the dollar amount of the "Award Fee Pool" referred to in the contract. The KNS-PBNS Contract provided that PBNS would be compensated, in part, based on actual hourly rates paid to its staff times a multiplier of either 1.8 for employees working out of KNS offices or 2.5 for employees working out of PBNS offices. The multipliers were designed to compensate PBNS for its overhead costs while the Award Fee was designed to provide PBNS with a profit on the Project.

15.     The KNS-PBNS Contract identified Cross Country as one of three primary lower tier subcontractors for design and contains a few other references to Cross Country's work on the Project. The KNS-PBNS Contract did not, however, state any intent to benefit Cross Country by the parties' performance thereunder.

16.     Under the terms of the KNS-PBNS Contract, KNS was required to provide PBNS with a guarantee of payment from KCC. This requirement was satisfied via a separate guarantee agreement signed by KCC. This agreement makes no reference to Cross Country.

17.     After execution of the KNS-PBNS Contract, the Award Fee Pool was set at $24,000,000. Initially, PBNS told Cross Country that it, along with PBNS's other two prime

subcontractors, might be included in the Award Fee Pool.  Around the time that the PBNS-Cross Country MOU was signed, however, PBNS advised Cross Country that this was no longer the case.  Thus, Cross Country's profit on the Project would be included in its labor compensation rates.

18.     Also after execution of the KNS-PBNS Contract, the parties continued to discuss an appropriate budget for PBNS's work on the Project.  Although KNS ultimately estimated a budget of approximately $135 million for PBNS, PBNS was paid over $200 million on the Project.  The budget therefore had no impact on PBNS's work on the Project and did not materially impact its dealings with Cross Country.

19.     Effective November 7, 1998, PBNS requested that Cross Country bill at the employee labor cost times a multiplier of either 1.8 or 2.5 consistent with the KNS-PBNS Contract (the "Hourly Rates").  The 1.8 multiplier was to be applied to Cross Country staff working out of KNS offices and to agents out in the field while the 2.5 multiplier was to be applied to Cross Country staff working out of Cross Country's offices.  This higher multiplier reflects the greater overhead costs associated with this latter category of staff.  The multipliers were, however, based on sound estimates of PBNS's overhead costs which were significantly higher than those of Cross Country.

20.     Cross Country billed and was paid by PBNS at the Hourly Rates from November 7, 1998 through January 30, 1999.  The Hourly Rates resulted in higher compensation to Cross Country than the Day Rates.

21.     To receive payment while the Day Rates and the Hourly Rates were in effect, Cross Country would submit its invoices and supporting documentation covering a two week

6

period to the PBNS office in Golden, Colorado.  PBNS would review Cross Country's invoices

for accuracy and make any appropriate deductions it deemed appropriate.  PBNS would then

submit Cross Country's invoices, along with invoices it received from its other subcontractors, to

KNS personnel in PBNS's Golden office for review.  KNS would also review the invoice for

accuracy and make any deductions it deemed appropriate.

22.     Shortly after execution of the KNS-PBNS Contract in September of 1998, PBNS

sent a proposed contract to Cross Country.  Around this same time,  John Harrison of PBNS

expressed concern that the rates being charged by PBNS's subcontractors may not be consistent

with the KNS-PBNS Contract and would have to be adjusted up or down accordingly.  Harrison

proceeded to calculate the amount he believed was due and owing to Cross Country under the

PBNS-Cross Country MOU and compared this amount to that which Cross Country had been

paid.  Through this calculation, Harrison concluded that Cross Country had been overpaid by

approximately $3 million.

23.     Based on Harrison's conclusion regarding overpayment to Cross Country, Mike

Della Rocca, President of PBNS, placed a stop payment order on Cross Country's invoices in

December of 1998.  Della Rocca's stop payment order was intended to ensure that there was

always approximately $4 million float still in process for payment to Cross Country so that PBNS

could easily recoup under the MOU any amount by which Cross Country had been overpaid.  The

issuance of the stop payment order was not communicated to Cross Country at the time it went

into effect.  Likewise, Harrison did not learn of the order until sometime around the end of

January of 1999.

24.     Monte Menard of PBNS, who was in charge of the processing of Cross Country

invoices at the time of Della Rocca's stop payment order, interpreted the order as a direction to cease both the processing and payment of Cross Country's invoices and acted accordingly.  As a result, Cross Country's invoices from mid-December forward were held in PBNS's Golden office and no action was taken to collect corresponding funds from KNS.  These actions resulted in an increase in the average time for payment of Cross Country's invoices.  The stop processing error was corrected at the end of February of 1999, and the float held in process pending contract negotiations.

25.     PBNS followed up on Harrison's initial calculation of overpayment to Cross Country with an audit and further calculations.  These additional efforts resulted in calculations of an overpayment to Cross Country ranging from $2  - $4.1 million.

26.     On February, 2, 1999, PBNS and Cross Country began face-to-face negotiations on a formal contract at PBNS's offices in Golden, Colorado.  Further face-to-face negotiations were held over the course of several days in February and April of 1999.  The principal participants in the negotiations were Harrison and Robert Janowski on behalf of PBNS and Jim Stevenson on behalf of Cross Country, all of whom were experienced businessmen.  During the course of the face-to-face meetings, the parties exchanged comments on a Record of Negotiations prepared by Harrison and the contract terms.  The Record of Negotiations reflects Stevenson's position statements on behalf of Cross Country.  The Record of Negotiations, **Joint Exhibits 30.1 - 30.3,** is the best evidence of the parties' negotiations.  Both parties signed the final Record, **Joint Exhibit 30.3,** which was appended to their final contract.

27.     During the February 2, 1999 negotiating session, PBNS advised Cross Country of its position that Cross Country had overbilled and been overpaid in the amount of $3.5 - $4.1

million and that PBNS was holding back payment to Cross Country in the amount of $4 million to cover the overpayment.  PBNS's position regarding overpayment was based on the language in the PBNS-Cross Country MOU that Cross Country would be compensated on a "cost-reimbursable basis."  Under both the Day Rates and the Hourly Rates, Cross Country had been compensated in excess of its costs.  PBNS further advised Cross Country of its position that any rates agreed to in their contract would be applied back to the beginning of the Project and all rates charged by Cross Country would be retroactively adjusted as necessary.  In response, Cross Country denied that it had been overpaid and asserted that any rates agreed to as part of its contract with PBNS must be applied on a going forward basis only.

28.     During the parties' heated early negotiations, both PBNS and Cross Country made strong statements regarding the future of their relationship.  Specifically, PBNS told Cross Country that unless they reached an agreement on terms, Cross Country would be replaced on the Project.  At that time, Cross Country had submitted outstanding invoices totalling over $5 million and was continuing to bill $1.5 million every two weeks.  Cross Country similarly threatened to quit the Project if the parties could not resolve their differences.

29.     Also during negotiations, PBNS represented to Cross Country that it was not entitled to a mark-up on invoices from its service providers.  Harrison and Janowski were unaware that in fact a change order to the KNS-PBNS Contract allowed PBNS to bill KNS for the actual cost of job shopper labor times a multiplier of 1.8 up to 1000 man months.  This was equivalent to a 6-7% mark-up on the amounts invoiced to PBNS by its service providers.  Once the cap of 1000 man months was met, the change order allowed PBNS to bill KNS the amount invoiced by its service provider plus a mark-up of 5%.  At the time of PBNS's representation that

it received no mark-up on job shopper labor, 60-70% of Cross Country's staff for the Project were job shoppers, and Cross Country had been receiving a significant mark-up on their labor costs under both the Day Rates and the Hourly Rates.

30.     In order to determine the appropriate compensation for Cross Country on the Project, PBNS requested information regarding Cross Country's overhead costs.  Unfortunately, Cross Country did not have sound cost history information.  Cross Country provided some cost information to PBNS on February 8, 1999 and proposed a blended multiplier for Cross Country employees and job shoppers of 1.3644.  This blended multiplier was calculated based on a 10% mark-up on amounts invoiced for job shopper labor.  In a telephone conversation on February 10, 1999, PBNS counterproposed a blended multiplier of 1.35, subject to approval by KNS.  Cross Country accepted this counterproposal on the rates it would be paid going forward.  Before a contract could be finalized, however, the parties still needed to resolve their dispute over Cross Country's past billings.

31.     On February 23, 1999, the parties met in person in an attempt to resolve their differences over Cross Country's past billings.  Initially, PBNS reiterated its position that the parties' newly negotiated rates should be applied back to the beginning of the Project and Cross Country's past invoices and payments adjusted accordingly.  When Cross Country rejected this approach, the parties began looking at other dates and methods for calculating a credit to PBNS. Ultimately, Cross Country proposed re-calculating its invoices for the time when the Hourly Rates were in effect, ie. November 7, 1998 through January 30, 1999, using a single multiplier of 1.85. Under this scenario, Cross Country calculated that PBNS would be entitled to a credit of $1.261 million.  Cross Country also agreed to forego billing $470,000 in unpaid per diem expenses for its

10

agents to which Cross Country believed it was entitled.   Though this proposal yielded a significantly lower credit than that to which PBNS believed it was entitled, it nonetheless agreed to it subject to approval by KNS.

32.   At the February 23, 1999 meeting, the parties also discussed getting Cross Country paid current and getting future invoices paid more expeditiously.   Though no specific promises were made regarding the timing of future payments, PBNS did agree to get Cross Country paid as soon as possible after PBNS received payment from KNS.   In this regard, PBNS estimated a turn around time of 45-55 working days.

33.   Following the parties' February 23, 1999 meeting, PBNS sought KNS's approval of their agreement with Cross Country.   KNS was reluctant to give its approval, however, and requested additional information.   To this end, Cross Country and PBNS had additional discussions concerning Cross Country's overhead expenses and calculation of the credit to PBNS. PBNS and Cross Country also discussed financial difficulties that both Cross Country and its service providers were experiencing.   To alleviate these difficulties, PBNS agreed to partially pay one of Cross Country's invoices for which PBNS had not yet been paid by KNS.   This payment of $1.5 million was made on March 8, 1999.   PBNS paid Cross Country an additional $2.2 million at the end of March of 1999, but continued to withhold approximately $4 million invoiced by Cross Country pending finalization of the parties' subcontract and resolution of the past billing issues.

34.   Cross Country, PBNS, and KNS met in person on April 7, 1999.   At this meeting, to maintain project continuity, KNS gave its approval to the go forward rates and credit to which Cross Country and PBNS previously agreed.   Cross Country and PBNS proceeded with a subcontract agreement that was executed on April 17, 1999 with provisions relating to the

payment of invoices and insurance left open for further review.   These outstanding issues were resolved, and the PBNS-Cross Country Contract was finalized later that month.

35.     The PBNS-Cross Country Contract provides that Cross Country will "defend and indemnify [PBNS], [KNS] and [Level 3] against and save them and the Project harmless from and against any and all claims, suits or lien therefore brought by [Cross Country's] own subcontractors, agents, suppliers and employees."   Elsewhere in the PBNS-Cross Country Contract, service providers are "defined as being distinct and excluded from any definitions associated with the terms Subcontractor or Sub-subcontractor."

36.     The parties' negotiations of the PBNS-Cross Country Contract were aptly summarized in the Record of Negotiations as follows:

> This negotiation was long and arduous.  Both parties felt that they were entitled to more favorable compensation terms - [Cross Country] felt that they were entitled to the full amount billed to date, which they contended were based on negotiated and/or dictated rates.  PBNS felt that under the cost reimbursable terms of the MOU, [Cross Country] was entitled to cost plus a reasonable (negotiated) profit.
>
> [Cross Country] contended that the cost for ROW services is typically between 2-8% of the total cost of a typical long-haul telecom job and they are providing these services to the Level 3 project at approximately 1.5% of the total cost.  They stated that while their rates may be higher than the industry norm, their ability to obtain ROW and permits quickly and efficiently more than makes up for their higher hourly cost.
>
> The compromise that was reached allows [Cross Country] to retain all but $1.261 million of the amount invoices through January 30, 1999 (less any billing adjustments required) and provides Level 3 substantially lower rates for [Cross Country's] services from February 1, 1999 forward.  While PBNS was not able to reduce [Cross Country's] rates as low as was desired, we were able to obtain a modest reduction in rates from November 7, 1998 through January 30, 1999, and a significant discount (23% below [Cross Country's] normal commercial rates) for the remainder of the project.  PBNS believes this settlement provides Kiewit and Level 3 with good value.  Over the life of the job, this Agreement is estimated to save 16% of the cost of the Permitting and ROW services (compared to [Cross

Country's] normal commercial rates).  Considering the alternative (disruptive effect of not being able to come to mutual terms on a subcontract), we felt this settlement was in everyone's best interest.

Prepared by:                                              Agreed to in substance:

s/ John Harrison_____          s/ Jim Stevenson_____
John Harrison for PBNS                              Jim Stevenson for [Cross Country]

**See Joint Exhibit 30.3,** p. 3.

37.     Under the PBNS-Cross Country Contract, a new billing procedure was implemented at KNS's direction.  Under this procedure, Cross Country's invoices and supporting documentation for a two week period would be submitted to one of 13 area offices. The invoices would then be reviewed first by PBNS personnel located at the area office and then by KNS personnel located at that office.  The invoices would then be sent to PBNS's Golden office for further review by PBNS and KNS personnel located there.  Under this new billing procedure, which was implemented in April of 1999, it took considerably longer for PBNS to receive payment for Cross Country's services from KNS.

38.     Cross Country continued working on the Project through the end of 2000 though 90% of its work was completed by the end of 1999.  From April of 1999 through the end of the Project, Cross Country performed under the terms of the PBNS-Cross Country Contract and was paid approximately $18 million. (In total Cross Country was paid $34,455,585.93 on the Project.) After execution of the parties' contract, with the exception of one passing comment approximately one year after execution of the PBNS-Cross Country Contract, Cross Country did not claim to be acting under duress in agreeing to the contract terms or take any action to set aside the same.  In fact, Cross Country agreed to extend the terms of the PBNS-Cross Country

13

Contract without comment.

39.     This action was initiated by Capital Land, one of Cross Country's service providers on the Project.  Level 3 has incurred attorney fees and costs on behalf of all Defendants defending against Capital Land's claims, which were previously settled.

## II.  Conclusions of Law

## A.  Cross Country's Claim for Breach of the PBNS -Cross Country MOU Against PBNS

1.     Cross Country claims that PBNS breached the PBNS-Cross Country MOU by: (1) failing to act in good faith in negotiating the PBNS-Cross Country Contract; (2) failing to enter into a contract with Cross Country that was substantially similar to that between PBNS and KNS; and (3) failing to pay Cross Country as required under the terms of the PBNS-Cross Country MOU and within a reasonable time after receipt of Cross Country's invoices.  Cross Country seeks rescission of the PBNS-Cross Country Contract and, if rescinded, damages under the third theory.  Cross Country has failed, however, to meet its burden of proof with respect to any of these alleged breaches.

2.     PBNS did owe Cross Country a duty of good faith and fair dealing under the PBNS-Cross Country MOU both as a matter of law and by the express terms of the MOU.  The legal duty of good faith and fair dealing arises anytime one party to a contract has discretionary authority to determine certain terms of the contract.  *Amoco Oil Co. v. Ervin,* 908 P.2d 493, 499 (Colo. 1995).  Given the lack of detail set forth in the PBNS-Cross Country MOU, PBNS had discretion in defining its terms.  In addition, the PBNS- Cross Country MOU itself provides that "[t]he parties shall work together in good faith to negotiate a final Subcontract for Services...."  I therefore analyze whether PBNS breached its duty of good faith.

14

3.      Cross Country alleges that PBNS breached its duty of good faith and fair dealing throughout the negotiation process of the PBNS-Cross Country Contract by withholding payment of $4 million, threatening to replace Cross Country on the Project and in interpreting the PBNS-Cross Country MOU so as to support a retroactive adjustment to the rates that Cross Country had previously billed and a corresponding credit to PBNS.  I disagree and conclude that PBNS's interpretation of the language in the MOU was entirely reasonable.  PBNS therefore acted well within its rights in withholding $4 million in payment to Cross Country so as to recoup any overpayment made to Cross Country.

4.      Cross Country's theory of breach of the duty of good faith is couched in terms of economic duress.  But under the circumstances here neither PBNS's withholding of approximately $4 million in payment nor its threat to replace Cross Country constitute breach of that duty.  "A contract is voidable on the grounds of duress if a party's manifestation of assent is induced by an improper threat that leaves no reasonable alternative."  *Vail/Arrowhead, Inc. v. District Court,* 954 P.2d 608, 612 (Colo. 1998).  Actions or threatened actions by a party to do that which it lawfully or even colorably has a right to do cannot be a wrongful threat or action giving rise to a claim of economic duress.  *DeJean v. United Airlines, Inc.,* 839 P.2d 1153, 1160 (Colo. 1992); *Cooper v. Flagstaff Realty,* 634 P.2d 1013, 1015 (Colo. App. 1981).  As set forth above, based on its reasonable interpretation of the PBNS-Cross Country MOU, PBNS did not act improperly in withholding approximately $4million in payment to Cross Country.  By the same token, PBNS did not act improperly in threatening to replace Cross Country on the Project based upon Cross Country's refusal to give PBNS the credit to which it reasonably believed it was entitled.  Although Cross Country was unquestionably under financial pressure throughout the

negotiation of the PBNS-Cross Country Contract based in part on its failure to adequately capitalize its participation on the Project and based partly on the actions of PBNS, this alone is insufficient to support its theory of economic duress.

5.     Cross Country's theory of economic duress also fails as a result of its opportunity for reflection prior to execution of the PBNS-Cross Country Contract.  *See Wiesen v. Short,* 604 P.2d 1191, 1192 (Colo. App. 1979) (quoting *Hastain v. Greenbaum,* 470 P.2d 741 (Kan. 1970) ("it is a general rule that a transaction cannot be held to have been induced by duress, notwithstanding any threats which may have been made, where the party had and took an opportunity for reflection and for making up his mind").  Stevenson represented that Cross Country was advised by in-house and retained counsel.  In his trial testimony, however, he admitted that this was false and merely a bargaining tactic.  Even so, Cross Country took full advantage of the time that lapsed between the commencement of the parties' negotiations in early February of 1999 and finalization of the PBNS-Cross Country Contract more than two months later.  Cross Country made numerous proposals and counter-proposals regarding its terms during the give and take of the negotiations.  This is precisely the type of negotiation process in which a court should be loathe to intervene.  *See Vail/Arrowhead, supra,* 954 P.2d at 613 ("Hard bargaining between experienced adversaries of relatively equal power ought not to be discouraged").

6.     Cross Country next claims that PBNS breached its duty of good faith and fair dealing under the PBNS-Cross Country MOU through its misrepresentation and concealment of material facts.  These same allegations form the basis of Cross Country's claims for fraud and deceit and will be discussed in greater detail in the context of analyzing these claims.  For present

16

purposes, however, I conclude that the evidence presented at trial relating to PBNS's alleged fraudulent misrepresentation and concealment do not give rise to a breach of PBNS's duty of good faith and fair dealing under the PBNS-Cross Country MOU.

7.     Finally, Cross Country alleges that PBNS breached its duty of good faith and fair dealing under the PBNS-Cross Country MOU in failing to provide Cross Country with a copy of the KNS-PBNS Contract.  This allegation is intertwined with Cross Country's claim that PBNS breached the MOU by failing to enter into a contract substantially similar to the KNS-PBNS Contract, and the same rationale supports my rejection of both claims.  First and foremost, the PBNS-Cross Country Contract merely states that the parties *intend* to enter into a contract substantially similar to that between KNS and PBNS.  This language does not impose a duty on either Cross Country or PBNS to agree to a contract that is substantially similar to the KNS-PBNS Contract.  Rather, the primary differences between the two contracts are attributable to the parties' long and arduous negotiation process in which Cross Country was an active participant and circumstances that made it impossible to include the same terms in the two contracts. Accordingly, I am not persuaded that the terms of the PBNS-Cross Country Contract  would have been different had Cross Country had the benefit of receiving a copy of the KNS-PBNS Contract and, therefore, conclude that Cross Country failed to meet its burden of proving that it is entitled to rescission as a result of not receiving such a copy.

8.     Cross Country's final claim for breach of the PBNS-Cross Country MOU relates to payment to Cross Country.  Having already concluded that PBNS was justified in withholding payment of approximately $4 million from Cross Country pending resolution of the parties' dispute over past billings, I further conclude that this conduct does not constitute a breach of the

MOU's payment provision.  In addition, neither the PBNS-Cross Country MOU nor the PBNS

Cross Country Contract specify the number of days within which Cross Country's invoices must

be paid following their submission, and no enforceable promises were made in this regard during

the parties' discussions.  This is understandable in view of the huge scope of the Project, the

complexity of billings for work performed on it, and the lack of control that PBNS had over

KNS's payment of invoices and billing procedures.  For these same reasons, Cross Country has

failed to meet its burden of establishing that PBNS failed to pay its invoices within a reasonable

time after submission.

9.      Likewise, with the exception of the amount of $358,307.31 to which PBNS agrees

is owing to Cross Country but subject to offset and/or subject to a KNS constructive trust, Cross

Country has failed to meet its burden of establishing that PBNS failed to pay all amounts due and

owing to Cross Country prior to the time that the PBNS-Cross Country Contract went into effect.

10.     For the reasons set forth above and as discussed further below, I reject Cross

Country's claim that the PBNS-Cross Country Contract should be rescinded.  Accordingly, the

Contract's provision that it settles all claims and prior billing disputes is dispositive of Cross

Country's claim for breach of the PBNS-Cross Country MOU's payment provisions in any event.

**B.    Cross Country's Claims for Fraud and Deceit Against PBNS**

11.     Cross Country claims that PBNS engaged in fraud and deceit by falsely

representing and concealing material facts from Cross Country prior to the execution of the

PBNS-Cross Country Contract.  Specifically, Cross Country alleges PBNS falsely represented

and/or concealed the stop payment order and that Cross Country's rates were not substantially

similar to the rates of PBNS.  That is, PBNS misrepresented that it was not entitled to a mark-up

18

on invoices from its service providers.  Based on the evidence presented at trial, I conclude that

Cross Country has failed to meet its burden of proof with respect to either of these alleged falsely

represented and/or concealed facts.

12.     The elements of a claim  for fraudulent misrepresentation are as follows:

1) a representation; 2) of material facts; 3) that is false; 4) made with knowledge of the falsity or with indifference to its truth or falsity; 5) the party claiming fraud must have relied on the representation; 6) have had a right to have relied on it; and 7) acted in accordance with the reliance; and 8) in doing so suffer damage.

*Institute for Prof. Development v. Regis College,* 536 F.Supp. 632, 633 (D.Colo. 1982).  With

respect to the sixth element, a party has a right to rely on a misrepresentation where such reliance

is justified and reasonable.  *See Lurvey v. Phil Long Ford, Inc.,* 541 P.2d 114, 116 (Colo. App.

1975) (citing Colo. Jury Inst. 19:1).

13.     The elements of a claim for fraudulent concealment are as follows:

(1) concealment of a material fact that in equity and good conscience should be disclosed; (2) knowledge on the part of the party against whom the claim is asserted that such a fact is being concealed; (3) ignorance of that fact on the part of the one from whom the fact is concealed; (4) the intention that the concealment be acted upon; and (5) action on the concealment resulting in damages.

*Nielson v. Scott,* 53 P.3d 777, 779 (Colo. App. 2002).

14.     Turning to Cross Country's specific allegations of fraud and deceit, I conclude that

PBNS's failure to disclose the existence of the stop payment order prior to February 2, 1999 does

not constitute fraudulent concealment.  First, there is no evidence that this order was known to

the parties communicating with Cross Country regarding the payment of its invoices in December

of 1998 and January of 1999.  In addition, I am not persuaded that Cross Country would have

pursued a different course of action had it known about the stop payment order prior to February

2, 1999.  The simple fact of the matter is that Cross Country knew it had significant unpaid invoices regardless of the reason.

15.     Furthermore, from credible trial testimony it is clear that at the outset of negotiations PBNS advised Cross Country that it was withholding approximately $4 million PBNS claimed it had overpaid Cross Country.  Indeed, the PBNS credit was a central point in the parties' negotiations.

16.     PBNS clearly erred in representing that it did not receive a mark-up on job shopper labor during the course of the parties' contract negotiations.  This misrepresentation is not actionable, however, because: (1) Cross Country did not meet its burden of establishing that the misrepresentation was made with knowledge of its falsity or with indifference thereto; and (2) Cross Country has failed to meet its burden of establishing that it acted to its detriment in reliance on this misrepresentation.  In fact, Cross Country negotiated for and received a greater mark-up on job shopper labor under the terms of the PBNS-Cross Country Contract than that which PBNS received under the terms of the KNS-PBNS Contract.

17.     Because Cross Country cannot prevail on any of its claims against PBNS, it is not entitled to rescission of the PBNS-Cross Country Contract.  This result is also dictated by PBNS's affirmative defenses of ratification and accord and satisfaction discussed in greater detail below.

## C.     PBNS's Affirmative Defenses of Ratification and Accord and Satisfaction

18.     Ratification of a contract can be manifested in the following ways:

a party may ratify, first, by intentionally accepting benefits under the contract; second, by remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it; and third, by recognizing [the] validity of the contract by acting

upon it, performing under it, or affirmatively acknowledging it.

*United States v. McBride,* 571 F.Supp. 596, 613 (S.D. Tex. 1983) (applying Colorado contract law). "What act constitutes ratification or disaffirmance is ordinarily a question of law to be determined by the trial court." *Jones v. Dressel,* 623 P.2d 370, 374 (Colo. 1981).

19.     Here, Cross Country performed under the PBNS-Cross Country Contract without complaint as to its validity for a significant period of time during which it reaped substantial benefits.  Cross Country nonetheless asserts that its performance cannot constitute ratification of the Contract because it did not learn of the true surrounding facts until after the commencement of this litigation.  As set forth above, however, Cross Country has failed to prove its claims against PBNS for fraud and deceit.  Under these circumstances, I conclude that the Cross Country ratified the PBNS-Cross Country Contract.

20.     With the execution of the PBNS-Cross Country Contract, the parties also reached an accord and satisfaction regarding their dispute over the PBNS-Cross Country MOU.  "An accord is a contract under which an obligee promises to accept a stated performance in satisfaction of the obligor's existing duty.  Performance of the accord satisfies the original duty." *R.A. Reither Constr., Inc. v. Wheatland Rural Elec. Ass'n.,* 680 P.2d 1342, 1344 (Colo. App. 1984) (citing *Restatement (Second) of Contracts* § 287).  "The essential elements of an effective accord and satisfaction are proper subject matter, competent parties, meeting of the minds of the parties, and consideration." *Nevada Half Moon Mining Co. v. Combined Metals Reduction Co.,* 176 F.2d 73, 76 (10th Cir. 1949), *cert. denied,* 338 U.S. 943 (1950).  Whether these elements are present is a question of fact. *Reither Constr., supra.*

21.     Here, Cross Country and PBNS engaged in lengthy negotiations concerning their

dispute over past billings and terms of performance.  These negotiations culminated in the

execution of the PBNS-Cross Country Contract in which both Cross Country and PBNS gave up

greater benefits than that to which they strongly believed they were entitled.  All of the credible

evidence demonstrates that PBNS performed its obligations under the PBNS-Cross Country

Contract.  This performance therefore satisfied any additional obligations PBNS may have owed

Cross Country under the terms of the PBNS-Cross Country MOU, and Cross Country is

therefore precluded from asserting claims relating to this prior agreement.

**D.**     **Cross Country's Claim for Constructive Trust Against KNS**

22.     A constructive trust is an equitable doctrine designed to compel one who unfairly

holds a property interest to convey that interest to another to whom it justly belongs.  *In re*

*Marriage of Allen*, 724 P. 2d 651, 656-7 (Colo. 1986).  In *Allen*, the Colorado Supreme Court

stated that a successful plaintiff in a constructive trust action is entitled to an in personam order

that requires the defendant, as constructive trustee, to transfer specific property in some form to

the plaintiff, as the beneficiary of the trust.  *Id*. at 657.

23.     The focus on specific property requires a plaintiff seeking to impose a constructive

trust to trace the wrongfully held property.  *In re Foster*, 275 F.3d 924, 926-7 (10th Cir. 2001).

If the plaintiff is able to successfully trace the wrongfully held property to the defendant, then a

constructive trust may be imposed even if such property is fungible or has been commingled with

other like property.  *Lyons v. Jefferson Bank & Trust*, 793 F. Supp. 981, 986 (D. Colo. 1992).

Thus, a constructive trust need not apply to a specific *res*.  *Id*.  There must, however, be some *res*

on which a constructive trust can be imposed.  *Restatement of Restitution* § 160, cmt. I (1936).

24.     Beginning in October of 1998, disallowances were made to amounts invoiced by

22

Cross Country.  KNS subsequently approved $$358,307.31 of the disallowed amounts and paid

the corresponding funds to PBNS.  PBNS later remitted these funds back to KNS.

25.     PBNS and KNS acknowledge that $358,307.31 is due and owing to Cross

Country but asserts that this amount may be subject to offset if Defendants prevail on their claims.

Based on Defendants' admission and  the legal analysis set forth in the remainder of this Order , I

conclude that Cross Country is entitled to the imposition of a constructive trust against KNS in

the amount of $358,307.31.

**E.      Cross Country's Claim for Breach of Contract Against KNS**

26.     Cross Country's claim for breach of contract against KNS is predicated on its

purported status as a third-party beneficiary to the KNS-PBNS Contract.  More specifically,

Cross Country argues that KNS is liable to it under this Contract for failing to pay amounts

invoiced to PBNS by Cross Country.  As discussed above, however, KNS paid PBNS the only

funds that are currently due and owing to Cross Country.  In addition, Cross Country has failed to

meet its burden of proving that it is a third-party beneficiary under the KNS-PBNS Contract.

27.     Colorado has adopted the approach taken in the *Restatement (Second) of*

*Contracts* in determining  whether a subcontractor is a third-party beneficiary of a contract.

*See R.N. Robinson & Son, Inc.,* 31 F. Supp. 2d 881, 887 (D.Colo. 1998) (*citing E.B. Roberts*

*Construction Co. v. Concrete Contractors, Inc.,* 704 P.2d 859, 865 n. 7 (Colo. 1985)).  Under

this approach, a subcontractor has a right to sue on a contract as a third-party beneficiary  where

"(a) the performance of the promise will satisfy an obligation to the promisee to pay  money to the

beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the

benefit of the promised performance."  *R.N. Robinson & Son, Inc., supra*, 31 F. Supp.2d at 887.

Further,

> [a] person not a party to an express contract may bring an action on such contract if the parties to the agreement intended to benefit the non-party, provided that the benefit claimed is a direct and not merely an incidental benefit of the contract. (citation omitted).  While the intent to benefit the non-party need not be expressly recited in the contract, the intent to benefit the non-party must be apparent from the terms of the agreement, the surrounding circumstances, or both.

*Id.*

28.    In order to succeed on its claim for relief as a third-party beneficiary of the KNS-PBNS Contract, Cross Country must prove that it is in the limited class of people intended by KNS and PBNS to directly benefit from it.  In this regard, Cross Country's claim fails because the evidence merely establishes knowledge on the part of KNS that Cross Country would be performing work on the Project and under what terms.

**F.    Cross Country's Claim for Breach of Contract Against KCC**

29.    Cross Country's claim for breach of contract against KCC is likewise predicated on its purported status as a third-party beneficiary to the guarantee provided by KCC.  More specifically, Cross Country argues that KCC is liable to it under the guarantee agreement for amounts invoiced to PBNS by Cross Country that were not paid by KNS.  Here again, however, KNS paid PBNS the only funds that are currently due and owing to Cross Country.  In addition, Cross Country has failed to meet its burden of proving that it is a third-party beneficiary under the guarantee agreement.

30.    Applying the same legal standards set forth above, Cross Country's claim for breach of contract against KCC based on the guarantee agreement must also fail because no evidence was presented to support a finding that KCC intended for Cross Country to directly

24

benefit from this agreement.

**G.     PBNS's Claim for Breach of the PBNS-Cross Country MOU Against Cross Country**

31.     PBNS claims that Cross Country breached the PBNS-Cross Country MOU by threatening to quit the Project during the parties' contract negotiations. Cross Country's statements in this regard were, however, justified based on the parties' legitimate dispute over amounts paid to Cross Country.  For the same reason, I have also concluded that comparable statements by PBNS are not actionable.  Accordingly, PBNS's claim for breach of the PBNS-Cross Country MOU must fail.

**H.     Level 3's Claim for Breach of Contract Against Cross Country**

32.     Level 3's claim for breach of the PBNS-Cross Country Contract requires the same analysis set forth above regarding third-party beneficiaries.  Here, however, a clear intent to directly benefit Level 3 is apparent from the language of the contract itself.  Thus, Level 3 is entitled to assert a claim on the PBNS-Cross Country Contract.

33.     I further conclude that Capital Land was a subcontractor and/or agent of Cross Country on the Project and that the indemnification provision set forth in the PBNS-Cross Country Contract is therefore applicable to this case.  Any amounts that Level 3 is entitled to recover under this provision shall, however, be determined in a trial to be set on damages.


**I.     Summary**

34.     In conclusion, I find and conclude that Cross Country has failed to meet its burden of proving its claims with the sole exception of its claim for constructive trust against KNS.  I further find and conclude that PBNS has failed to meet its burden of proving its claim for breach

of the PBNS-Cross Country MOU against Cross Country.  Finally, I find and conclude that Level

3 has met its burden of proving its claim for breach of contract (indemnity) against Cross Country,

damages to be determined.

Accordingly, IT IS ORDERED that:

1.      Judgment shall enter in favor of Defendant PB Network Services, Inc. on Plaintiff

Cross Country Land Services, Inc.'s claims for breach of the PBNS-Cross Country MOU and for

fraud and deceit;

2.      Judgment shall enter in favor of  Plaintiff Cross Country Land Services, Inc. on its

claim for constructive trust against Defendant Kiewit Network Services, Inc., which shall hold

$358,307.31 in trust for Cross Country;

3.      Judgment shall enter in favor of  Defendant Kiewit Network Services, Inc. on

Plaintiff Cross Country Land Services, Inc.'s claim for breach of contract;

4.      Judgment shall enter in favor of  Defendant Kiewit Construction Co. on  Plaintiff

Cross Country Land Services, Inc.'s claim for breach of contract;

5.      Judgment shall enter in favor of  Plaintiff Cross Country Land Services, Inc. on

Defendant PB Network Services, Inc.'s claim for breach of the PBNS-Cross Country MOU;

6.      Judgment shall enter in favor of Defendant Level 3 Communications, L.L.C. on its

claim for breach of contract against Plaintiff Cross Country Land Services, Inc. with the judgment

amount to be determined at a forthcoming trial on damages; and

7.      The parties shall submit briefs regarding the issues left to be determined at a

forthcoming trial within 20 days of the date of this Order.

Dated: December    30   , 2005 in Denver, Colorado.

BY THE COURT:


    s/Lewis T. Babcock
LEWIS T. BABCOCK, CHIEF JUDGE